**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LANCE BROWN; LYNN BAILEY; and BRAILEY INVESTMENTS, LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. |
| | ) |
| RAMO BEY; MICHAELE BEY; ALEXANDER RANJHA; IFLIP CHICAGO, LLC; ENVISION FUNDING SOLUTIONS, LLC; and COVENANT HOLDINGS GROUP, LLC, | ) **JURY DEMAND** ) ) ) ) ) ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs Lance Brown, Lynn Bailey and Brailey Investments, LLC ("Brailey"), by and through their undersigned counsel, bring this Complaint against Defendants Ramo Bey, Michaele Bey, Alexander Ranjha, iFlipChicago, LLC ("iFlip"), Envision Funding Solutions, LLC ("Envision") and Covenant Holdings Group, LLC. Plaintiffs allege as follows:

## Introduction

1.      This is an action to hold Defendants accountable for their roles in luring inexperienced real estate investors into a devastating financial trap disguised as a lucrative business opportunity. By posing as legitimate and experienced real estate investors, financial services and other service providers, Defendants persuaded Plaintiffs to give them tens of thousands of dollars of their hard-earned money with the belief that Plaintiffs would ultimately prosper from flipping and selling a property. Far from financial gain, the only thing waiting for Plaintiffs at the end of their home rehabilitation project was complete financial ruin.

2. Defendants Ramo Bey and Michaele Bey, who have gained notoriety as successful real estate investors by purportedly buying, renovating, and selling distressed properties, are the founders of iFlip. Now defunct, iFlip marketed itself as a "premier real estate group" that provided "hands-on learning to new real estate investors." As part of that learning, iFlip offered an educational "bootcamp" that would teach prospective investors about how to buy, flip and re-sell properties. On its website, iFlip emphasized that prospective investors did not need good credit to join the bootcamp.

3. Luring prospective investors to participate in the iFlip bootcamp was step one for iFlip and its associates. Once potential investors joined the bootcamp, the Beys and iFlip used the bootcamp as an opportunity to sell participants on a second iFlip offering: the iFlip "Joint Venture Program."

4. The program—which iFlip advertised on its website as the "best JV Platform for real estate investors in Chicago"—was designed to guide new investors through the entire process of purchasing, flipping and re-selling an investment property. Together, iFlip and its Joint Venture Program partner (the investor), would purchase a property, flip it, and re-sell it for a profit.

5. On one side of the Joint Venture Program, iFlip would take 30% of the profits in exchange for handling the day-to-day operations, including overseeing construction and renovations, coordinating draw schedules, obtaining the necessary permits, and teaching the investor how to successfully flip properties. On the other side of the Joint Venture Program, the investor would receive 70% of the profits and was required to finance the entire operation, including purchasing the property and covering all renovation/construction costs.

6. Critically, in order to participate in the Joint Venture Program, iFlip and the Beys required participants to use iFlip's own "preferred" legal counsel, lenders, brokers, and construction companies in connection with the project. After the Beys used their "expertise" to select a property for a Joint Venture Program participant, the Beys arranged for iFlip's preferred lender—in this case, Envision—to prepare financing documents for the property. The Beys then sent their preferred legal counsel—in this case, Alexander Ranjha—to the closing on the Joint Venture Program participant's property after Ranjha coordinated with the lender in advance. In this way, the Beys, iFlip and their associates convinced the Joint Venture Program participants that the program was real, that the transaction was legitimate, and that the participants were on a path toward a lucrative property investment.

7. In reality, the Joint Venture Program participants were on a path toward foreclosure, which was paved by lies from the Beys, iFlip, Envision, Ranjha and their many known and unknown associates.

8. Instead of using each participant's loan proceeds to fund a rehabilitation project on each participant's investment property, the Beys, iFlip and their associates secretly converted investors' loan proceeds during the closing afterwards. The Beys and iFlip—with the assistance of Ranjha, Envision and other co-conspirators—deliberately failed to disclose hidden fees that directly benefitted Defendants at the expense of Plaintiffs; re-directed Plaintiffs' loan proceeds to other properties involved in the iFlip Joint Venture Program; failed to disclose material defects in the properties; failed to disclose material conflicts of interest; stopped paying contractors hired to rehab the properties; and ultimately caused Plaintiffs' entire investment to collapse.

9.      Plaintiffs were just some of Defendants' many victims. After learning that the property they purchased through the Joint Venture Program had significant foundation issues that had not been disclosed during the sale process, Plaintiffs attempted to sell the property to mitigate their losses. Only then did Plaintiffs learn, to their horror, that Defendants had surreptitiously hidden "cross-collateralization" provisions in the closing documents that subjected Plaintiffs to over $80,000 in unpaid mortgage payments owed by other Joint Program Venture participants on separate properties, and that Plaintiffs had been defrauded.

10.     Plaintiffs have suffered immense financial and emotional damages as a direct result of Defendants' fraudulent actions. Plaintiffs therefore seek compensatory, statutory and punitive damages through this action.

### Jurisdiction and Venue

11.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, since Plaintiffs' claims arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.*

12.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims occurred in this District, and the real property at the center of the fraudulent acts at issue in this case is in this District.

14.     Venue is also proper in this District pursuant to 18 U.S.C. § 1965(a) because some Defendants reside in this District.

### Parties

15.     Plaintiff Lance Brown is an individual and a citizen of Cook County, Illinois.

4

16.     Plaintiff Lynn Bailey is an individual and a citizen of Cook County, Illinois.

17.     Plaintiff Brailey Investments, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Brailey Investments was involuntarily dissolved on November 14, 2025.

18.     Defendant Ramo Bey is an individual and a citizen of Atlanta, Georgia.

19.     Defendant Michaele Bey is an individual and a citizen of Atlanta, Georgia.

20.     Defendant Alexander Ranjha is an individual and a citizen of Oak Brook, Illinois.

21.     Defendant iFlip is an Illinois limited liability company with its principal place of business in Chicago, Illinois. iFlip was involuntarily dissolved on May 9, 2025.

22.     Defendant Envision is a Georgia limited liability company with its principal place of business in Kennesaw, Georgia.

23.     Defendant Covenant Holdings Group, LLC is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Covenant was involuntarily dissolved on February 13, 2026.

**<u>Facts Common to All Counts</u>**

### A. <u>*iFlip and the Joint Venture Program*</u>

24.     Though it no longer appears to maintain an active website, during the time period at issue in this Complaint, iFlip marketed itself on its website as "a premier real estate group that focuses on providing hands-on learning experiences to new real estate investors with regards to buying, rehabbing and selling single-family homes across the Greater Chicagoland Area." *See* **Exhibit A.**

25.     One of iFlip's primary marketing tools was its website and social media accounts. iFlip used its website to promote its services to prospective real estate investors interested in

creating multiple streams of income through real estate. iFlip said it could do this in three different ways: (i) through an educational bootcamp; (ii) by helping customers and investors access capital; and (iii) through the iFlip "Joint Venture Program." *Id.*

26. The iFlip bootcamp was marketed as a real estate bootcamp course for inexperienced investors that would train real estate investors in every area of "flipping" properties in today's market. *Id.* iFlip promised that the comprehensive, multi-week bootcamp benefitted participants by teaching them strategies to aggressively flip properties. *Id.* The bootcamp was taught by the Beys, who touted their success as real estate investors, and cost $800 to attend. *Id.* iFlip told investors they did not need to have good credit to participate. *Id.*

27. Another service iFlip said it provided to prospective investors was access to capital. *Id.* iFlip characterized itself on its website as a "rehab loan and credit funding broker" that could offer financing resources and assistance to prospective investors who might not otherwise have the necessary cash reserves to gain access to capital. *Id.*

28. But iFlip's primary offering to prospective investors was its purportedly best-in-class "Joint Venture Program." iFlip designed and marketed its Joint Venture Program as a way to walk prospective investors through the entire rehabilitation process "from A to Z," which iFlip would do by partnering with investors on their first rehab project. *Id.* One benefit of the Joint Venture Program, according to iFlip, was the fact that iFlip's total compensation for guiding investors through the house-flipping process was only "30% of the total profit after all expenses have been paid back to the Buyer." *Id.*

29. But the Joint Venture Program, according to iFlip, offered investors other benefits as well. iFlip publicly characterized itself as providing participants with several different services through the Joint Venture Program. These included: (i) preapproval with any needed credit

funding; (ii) identifying profitable investment properties for purchase; (iii) preapproval with a rehab lender; (iv) construction bids, scope of work and home design before closing; (v) guiding buyers through the closing process with a member and attorney; (vi) coordinating draw schedules, lien waivers and timelines; (vii) managing day-to-day construction with contractors and architects; (viii) scheduling open houses with realtors and members; and (ix) selling the property. *Id.*

30.     iFlip also frequently posted social media posts about its "successful" rehab projects, all in an effort to persuade prospective investors that iFlip was a legitimate company with a proven track record of helping participants appreciate positive returns on their investment.

### B.  *Plaintiffs Learn of iFlip*

31.     In early 2021, Mr. Brown and Ms. Bailey were introduced to Ramo Bey and "iFlip" by a family member who knew that Mr. Brown and Ms. Bailey were interested in getting involved in real estate investing.

32.     Mr. Brown and Ms. Bailey were not experienced real estate investors and were drawn to iFlip, in part, because it specifically targeted individuals who did not have any experience investing in real estate and were interested in learning how to do it. Intrigued by iFlip's offerings, Mr. Brown and Ms. Bailey signed up for the bootcamp in March 2021.

33.     During the bootcamp, the Beys heavily marketed the iFlip Joint Venture Program, touting the success of the program at helping investors build equity by rehabbing homes. The Beys made numerous statements to induce Plaintiffs to join the iFlip Joint Venture Program.

34.     The Beys promised Plaintiffs that iFlip would provide investors in the iFlip Joint Venture Program with mentorship, education and coaching—all of which would come directly from the Beys, who represented themselves as successful real estate investors. In this

way, the Beys promised, Plaintiffs would learn how to turn a property into a profitable investment.

35. The Beys told Plaintiffs that the Beys used their own expertise to initially identify the Property as a suitable property for Plaintiffs to rehab as part of a joint venture with iFlip. Ramo Bey also emphasized to Plaintiffs that before purchasing a property to flip, he would inspect each property with the assistance of various trusted professionals to determine whether the desired property had any structural or other issues.

36. The Beys told Plaintiffs that it would be Plaintiffs' responsibility to provide the capital for the entire project, including but not limited to financing for the purchase of the Property, construction costs and any transaction or other fees. But the Beys promised to provide Plaintiffs with access to capital by introducing Plaintiffs to lenders willing to provide them with financing to purchase the Property.

37. The Beys told Plaintiffs that the Beys would also provide other experienced professionals to facilitate the closing on the Property—all of whom would be hand-selected by the Beys.

38. The Beys also told Plaintiffs that the Beys would handle the logistics and day-to-day operations of the Property rehab project. The Beys promised to manage construction timelines, coordinate with the general contractor and sub-contractors, coordinate draw schedules, and obtain necessary permits, among other things.

39. Critically, the Beys and iFlip told Plaintiffs that each rehabilitation project had a quick turnaround time. Ramo Bey told Plaintiffs that, from start to finish, the entire process of purchasing, renovating and re-selling a property as part of the iFlip Joint Venture Program would only take between six and nine months. Promise of a quick turnaround time was

instrumental for convincing Plaintiffs to ultimately agree to participate in the Joint Venture Program.

40. In exchange for all of these services, the Beys told Plaintiffs that iFlip would receive 30% of the total profit from the sale of the Property. This agreement was memorialized in a written agreement that Brailey Investments and one of the Beys' limited liability companies, defendant Covenant Holdings LLC ("Covenant"), signed on October 18, 2021. *See* **Exhibit B.**[1]

41. The Beys made the foregoing promises to Plaintiffs knowing that they were false.

42. Upon information and belief, during the relevant time period, iFlip was not a licensed real estate broker or agency in the State of Illinois, despite holding itself out to the public and to Plaintiffs as a "premier real estate group" in the Chicagoland area. *See* Ex. A. Ramo Bey was also not a licensed realtor or broker.

43. The Beys also knew, when they first met Plaintiffs in 2021, that far from being successful real estate investors, the Beys had a history of mortgage foreclosures, property-related violations, and failing investment properties.

44. In December 2018, for example, the Beys were sued for failing to make payments on a loan they took out through Covenant. *See* **Exhibit C.** The creditor in that case sought over $216,000 for the Beys' and Covenant's failures to pay for a loan in connection with an investment property in Chicago. *Id.*

45. Upon information and belief, Ramo Bey was also a defendant in multiple mortgage

---

[1] Ramo Bey told Plaintiffs that Covenant was one of the limited liability companies he and Michaele Bey owned. Plaintiffs understood, when signing the Joint Venture Agreement, that the agreement was being made in connection with the iFlip Joint Venture Program, despite the fact that Covenant was the signatory to the agreement.

foreclosure actions brought by creditors in the State of Illinois in 2008, 2009, 2012, and failed to pay taxes on several properties he owned.

46. Upon information and belief, Ramo Bey was also the defendant in numerous housing-related complaints brought by the City of Chicago, including complaints for dangerous and unsafe property conditions in 2012, 2013 and 2021.

47. The Beys told Plaintiffs none of this.

48. Relying on iFlip's and the Beys' representations about the success of the program, on May 28, 2021, Mr. Brown texted Ramo Bey to let him know that Mr. Brown and Ms. Bailey were interested in partnering with iFlip and the Beys as part of iFlip's Joint Venture Program. On June 21, 2021, Ramo Bey texted Mr. Brown and stated that because Mr. Brown was "working with about 100k," Ramo Bey could "move [Mr. Brown] to the top of the list" of others interested in partnering with iFlip and the Beys.

49. iFlip and the Beys selected the property that Mr. Bey and Ms. Bailey would flip as part of the iFlip Joint Venture Program. Specifically, iFlip and the Beys selected a property located at 9439 South May Street in Chicago, Illinois (the "Property"). Ramo Bey told Plaintiffs that he and his team of professionals had inspected the Property and indicated that there had been various City code violations pertaining to the Property, but he said nothing about any structural issues he observed when inspecting the Property with his team.

50. Ramo Bey and iFlip told Mr. Brown and Ms. Bailey that, in order to participate in the Joint Venture Program, they needed to form a limited liability company, get an EIN and set up a bank account. They then told Mr. Brown and Ms. Bailey that, in exchange for $100, Ramo Bey would prepare an operating agreement for the limited liability company. Mr. Brown and Ms. Bailey

10

obliged. Ramo Bey provided Plaintiffs with a completed operating agreement containing Ms. Bailey and Mr. Brown's names as the only members of Brailey Investments.. *See* **Exhibit D.**

51. On or around July 17, 2021, Ramo Bey sent Mr. Brown a copy of a "Multi-Board Residential Real Estate Contract" for the Property ("Property Sale Agreement"). *See* **Exhibit E.** Nearly all of the details included in the Property Sale Agreement had been completed by the Beys or iFlip, including the buyer name, property description, brokerage information and mortgage company. The "Buyer" was listed as Brailey Investments, and the Property Sale Agreement listed the "Buyer's Attorney" as Alex Ranjha. *Id.* at 14. Neither Ms. Bailey nor Mr. Brown knew who Alex Ranjha was or spoke to him before signing the Property Sale Agreement, nor did they write his name on the agreement. Additionally, the Property Sale Agreement listed the "loan officer" for the transaction as Ramo Bey, despite the fact that Ramo Bey had not, upon information and belief, been a loan officer affiliated with any mortgage company Plaintiffs understood to be involved in the transaction. *Id.*

52. iFlip arranged for the Property Sale Agreement to be sent to Mr. Brown and asked for his signature. Mr. Brown signed the Property Sale Agreement on July 17, 2021.

### C. *Plaintiffs Close on the Property*

53. On October 18, 2021, Ramo Bey texted Mr. Brown and Ms. Bailey to inform them that they were "clear to close" on the Property. Ramo Bey then told Mr. Brown and Ms. Bailey that, "when we get closer to the actual [closing] date, our Attny will coordinate with you on a date and he'll let you know what the exact amount you'll need to bring to the table." The attorney Ramo Bey referenced was defendant Alex Ranjha.

54. On October 29, 2021, less than two weeks before the closing on the Property, Mr. Brown received a text message from Ranjha, who introduced himself to Mr. Brown as "Attorney

Alex Ranjha." Throughout the course of brief text exchanges between Ranjha and Mr. Brown between October 29, 2021 and November 10, 2021, Ranjha spoke to Mr. Brown about the logistics of the closing on the Property, as Ramo Bey had told Mr. Brown that their—iFlip's and the Beys'—attorney would do.

55. Ranjha also made various statements about the lender in those text messages, repeatedly saying that the lender moved slowly, based on Ranjha's knowledge of the lender. Ranjha also told Mr. Brown that the lender told him, Ranjha, that the closing was running behind.

56. The Beys and Ranjha coordinated with Envision, the lender the Beys, iFlip and Covenant selected to finance the Property, to plan the closing on the Property. Envision is a Georgia-based mortgage lender that holds itself out on its website as having a "mission . . . to set a high standard in the loan industry" by being "committed to quality customer service" and "putting the people [it serves] first." *See* **Exhibit F.**

57. Envision was the lender for other properties associated with iFlip and other participants in iFlip's Joint Venture Program.

58. For example, on July 21, 2021, Envision provided a commercial mortgage for a property located at 9825 S. Wood Street in Chicago, Illinois ("South Wood Property"). The South Wood Property was purchased by another participant in, and in connection with, the iFlip Joint Venture Program.[2]

59. On August 26, 2021, Envision provided a commercial mortgage for a property located at 7339 S. Bennett Avenue in Chicago, Illinois ("South Bennett Property"). Ramo Bey signed the mortgage as a managing member of the mortgagor, KJ Housing, LLC. *Id.* The South

---

[2] An action to foreclose on the South Wood Property was brought in the Circuit Court of Cook County on June 17, 2024.

Bennett Property was purchased by another participant in, and in connection with, the iFlip Joint Venture Program.[3]

60. On November 19, 2021, Envision provided a commercial mortgage for a property located at 6215 South Evans Street in Chicago, Illinois ("South Evans Property"). Ramo Bey signed the mortgage as a member of the mortgagor, Barnett Properties, LLC. *Id.* The South Evans Property was purchased by another participant in, and in connection with, the iFlip Joint Venture Program.[4]

61. On December 3, 2021, Envision provided a commercial mortgage for a property located at 8243 S. Honore Street in Chicago, Illinois ("South Honore Property"). Ramo Bey signed the mortgage as a member of the mortgagor, Xmas Properties LLC. *Id.* The South Honore Property was purchased by another participant in, and in connection with, the iFlip Joint Venture Program.

62. On August 10, 2022, Envision provided a commercial mortgage for a property located at 6627 South Maryland Avenue in Chicago, Illinois ("South Maryland Property"). Ramo Bey signed the mortgage as a member of the mortgagor, Small Steps 2 Giant Gains LLC. *Id.* The South Maryland Property was purchased by another participant in, and in connection with, the iFlip Joint Venture Program.[5]

63. On August 17, 2022, Envision provided a commercial mortgage for a property located at 6636 South Ingleside Avenue in Chicago, Illinois ("South Ingleside Property"). Ramo Bey signed the mortgage as a managing member of the mortgagor, Zahrapops LLC. The South

---

[3] An action to foreclose on the South Bennett Property was brought in the Circuit Court of Cook County on February 2, 2024.

[4] An action to foreclose on the South Evans Property was brought in the Circuit Court of Cook County on February 2, 2024.

[5] An action to foreclose on the South Maryland Property was brought in the Circuit Court of Cook County on February 29, 2024.

Ingleside Property was purchased by another participant in, and in connection with, the iFlip Joint Venture Program.[6]

64. On October 3, 2022, Envision provided a commercial mortgage for a property located at 6615 South Ellis Avenue in Chicago, Illinois ("South Ellis Property"). Ramo Bey signed the mortgage as a member of the mortgagor, D.W.A.N. Investment Group L.L.C. The South Ellis Property was purchased by another participant in, and in connection with, the iFlip Joint Venture Program.[7]

65. Upon information and belief, Envision extended mortgages to several more individuals and entities iFlip and the Beys, with the help of their associates, lured into the Joint Venture Program.

66. Plaintiffs closed on the Property on November 10, 2021. It was at that closing when Mr. Brown and Ms. Bailey had their first and only in-person meeting with Ranjha. Because the Beys and iFlip had advertised that they provided various qualified professionals to assist in the home purchasing, renovating and re-selling process as one of the primary benefits of the Joint Venture Program, Plaintiffs believed the Beys and iFlip had sent Ranjha to the closing to represent Plaintiffs' interests.

67. Ranjha did not provide Plaintiffs with an attorney-client agreement before, during or after the closing. Plaintiffs nevertheless did not have their own separate legal counsel and trusted Ranjha and the Beys because of various testimonials the Beys had publicized about completed rehabilitation projects.

---

[6] An action to foreclose on the South Ingleside Property was brought in the Circuit Court of Cook County on September 25, 2024.

[7] An action to foreclose on the South Ellis Property was brought in the Circuit Court of Cook County on March 29, 2024.

68. Under the loan agreement for Plaintiffs' Property presented at the closing, Envision was to provide Plaintiffs with a hard money loan in the amount of $266,750 to finance the purchase of the Property. The loan was subject to the terms of a promissory note Plaintiffs made in favor of Envision, and secured by the commercial mortgage, security agreement, and fixture filing, which Plaintiffs also made in favor of Envision. Envision charged Plaintiffs an interest rate of 9.99% on the loan, and the entire balance of the loan was to be paid by November 10, 2022—one year later. *See* **Exhibit G.** Brailey Investments signed the loan mortgage, with Mr. Brown, Ms. Bailey and Ramo Bey all signing the document as a "member" of Brailey Investments. *See* **Exhibit H.** Ramo Bey told Plaintiffs that it was essential that he be named on the mortgage because the lender recognized him and would be willing to provide the loan if his name was on the loan documents.

69. The loan documents, including the promissory note and mortgage, listed Envision Funding Solutions LLC as a Georgia limited liability company having its principal place of business at 645 Madison Avenue, Floor 19, New York, NY 10022. *See* Exs. G, H. However, Envision does not list any New York address as its principal place of business in either its 2021 or 2022 Georgia Secretary of State annual reports. *See* **Exhibit I.** The address 645 Madison Avenue, Floor 19, New York, NY is the headquarters of Roc Capital. *See* **Exhibit J.**

70. Plaintiffs made a down payment of over $50,000 on the day of closing.

71. Despite holding himself out as an attorney, and despite iFlip's representations to Plaintiffs that Ranjha's role was to facilitate the closing as an attorney, Ranjha did virtually nothing to advise Mr. Brown and Ms. Bailey of the life-altering deal they were about to make.

72. Ranjha did not provide Mr. Brown and Ms. Bailey with the closing documents at any time before the closing, leaving them no time to adequately review them. During the closing

15

itself, Ranjha offered no guidance or advice about the legal implications of the closing documents except for during the few times when Mr. Brown and Ms. Bailey—two inexperienced real estate investors—asked for clarification.

73. When the closing concluded, Ranjha—through his law firm, Ranjha Law Group—collected an $895 closing fee from Mr. Brown and Ms. Bailey. *See* **Exhibit K.**

74. Had Ranjha provided any meaningful guidance to Mr. Brown and Ms. Bailey at the closing, he would have advised them that the closing documents contained troubling, unconscionable provisions that Mr. Brown and Ms. Bailey ultimately unknowingly signed.

75. Chief among these was a "collateral assignment" agreement that stated that Mr. Brown and Ms. Bailey would be liable for defaults on ***other properties they did not own or have any financial interest in.*** *See* **Exhibit L.**

76. Mr. Brown and Ms. Bailey had no reason to believe that such an unusual, non-standard and onerous provision was buried in their closing documents. Neither the Beys, iFlip nor Ranjha told them about this provision or told them that the brokers, lenders and other agents iFlip purported to deal with as part of the Joint Venture Program required that Plaintiffs sign such an agreement.

77. Additionally the "Schedule B" purporting to identify the properties subject to the collateral assignment agreement was blank. *See* **Exhibit __.** Ranjha did not tell Plaintiffs that even though the schedule was blank, Envision would rely on the schedule to later hold Plaintiffs responsible for defaults on other properties participating in the iFlip Joint Venture Program.

78. Ranjha also failed to inform Plaintiffs that, as a requirement of their closing on the Property, they were responsible for a $4,001.25 "Broker Fee" to Covenant, despite the fact that the Joint Venture Agreement did not say anything about a broker fee to Covenant, iFlip or the Beys.

*See* Exs. B and H.  Additionally, Covenant is not and was not a licensed real estate broker at any point, so Covenant was prohibited, under Illinois law, from accepting a broker fee in connection with an Illinois real estate transaction like the transaction pertaining to the Property.

79.     Upon information and belief, Ranjha had also represented the Beys, iFlip and Covenant as an attorney in other property transactions.

80.     Ranjha never disclosed to Plaintiffs that he was an attorney for iFlip, the Beys and Covenant. Indeed, Ranjha intentionally withheld that information from Plaintiffs because he knew that his close association with the Beys, iFlip and Covenant created an unwaivable conflict of interest in the Property transaction such that he could not—and did not—represent Plaintiffs' interests.

81.     After the closing on Plaintiffs' Property, Ranjha continued to facilitate closings with Envision and Ramo Bey in connection with the iFlip Joint Venture Program. Ranjha facilitated the closing on the South Maryland Property, South Honore Property and South Evans Property, at minimum. Upon information and belief, Ranjha closed on other properties for iFlip, Covenant and the Beys, and continued to serve as their attorney and agent in connection with the iFlip Joint Venture Program.

82.     Ranjha also later worked with iFlip or the Beys to renovate an investment property he purchased through his own limited liability company, Istikhara Investments.[8]

### D.     *Post-Closing*

---

[8] Istikhara Investments closed on a property at 638 E. 65th Street in Chicago, Illinois on November 19, 2021—the same day Plaintiffs closed on the Property and Ranjha failed to appear at the closing. As of April 2023, Ranjha was working directly with iFlip and/or the Beys to renovate the property.

83.     On November 11, 2021, Ramo Bey requested that Plaintiffs provide iFlip's and Covenant's designated contractor with a $15,000 initial draw payment immediately after closing on the Property. Plaintiffs obliged, and construction began.

84.     Nine months after the closing, in August 2022, construction came to a halt when the contractors the Beys had hired to perform the rehabilitation work demanded $35,000 to continue. Plaintiffs asked Ramo Bey why the contractors required this money, and Bey falsely stated that the money was for inflated supply prices.

85.     In fact, the contractor had stopped performing work on the Property because Ramo Bey was not paying him, in violation of his contractual obligations under the Joint Venture Agreement. Ramo Bey did not have the money to pay the contractor because, upon information and belief, Ramo Bey was using Plaintiffs' loan proceeds to pay expenses for properties associated with other investors in the iFlip Joint Venture Program.

86.     The Beys coordinated the re-direction of Plaintiffs' loan proceeds to other participants in iFlip's Joint Venture Program directly with Envision. Envision, as the lender for the other properties subject to the collateral assignment agreement Plaintiffs had unwittingly signed, knowingly and intentionally converted loan proceeds belonging to Plaintiffs to fund other properties and ventures in which the Beys were involved. Upon information and belief, the Beys, iFlip, Envision and Covenant continued to misdirect the proceeds of other investors in the Joint Venture Program through at least as late as July 2023.

87.     Plaintiffs were then forced to use their own $35,000 in funds to pay the contractor to continue working.

88.     Additionally, Plaintiffs were repeatedly shorted on their draw requests. In January 2023, for example, Plaintiffs requested a draw of $4,050 on their loan, but only received $1,620.

18

When Plaintiffs confronted Ramo Bey about the discrepancy, he said he would "check out" the draw report. Unbeknownst to Plaintiffs, the Beys, iFlip and Covenant had been using Plaintiffs' draw requests to fund draw requests, fees, expenses and payments for other individuals in the iFlip Joint Venture Program.

89.     As of May 2023—over a year and a half after closing and long past the six to nine months the Beys and iFlip had promised the entire purchase, renovation and sale process to take—construction was still not complete. It was then when the construction contractor told Ms. Bailey that Ramo Bey had caused him, the contractor, to lose his license, and the contractor would not complete the home unless Ms. Bailey and Mr. Brown paid him more money. Ms. Bailey and Mr. Brown refused, and they instead finished what outstanding construction they were able to afford.

90.     The Property was initially listed for sale in July 2023. It was during Plaintiffs' initial attempts to sell the Property that they learned, for the first time, that the Property had foundation issues causing excessive water leaks. These foundation issues had not been disclosed to Plaintiffs before they purchased the Property or at any point during the nearly two years of construction.

91.     Plaintiffs then learned from the contractor who had stopped working on the Property in May 2023 that Ramo Bey had told the contractor to put carpet in the basement—the location of the foundation issues causing significant water leaks—instead of putting drain tile, which would have alleviated the issue. Ramo Bey had not told Plaintiffs at any point that the contractor had advised him to put drain tile in the basement to alleviate any foundation issues.

92.     The construction delays and excessive costs of the rehabilitation project and problems with the Property caused Plaintiffs significant emotional and financial strain. In September 2023, at the age of just 35 years old, Ms. Bailey suffered a heart attack despite having no known heart problems before that date.

19

93. Construction on the Property finally concluded in April 2024, after Plaintiffs had used their own funds to fix the previously-undisclosed foundation issues. By this time, it had been two-and-a-half years since Plaintiffs closed on the Property.

94. In March 2024, after extensive delays and expending their own time and financial resources to complete the rehabilitation of the Property, Plaintiffs found a potential buyer. Plaintiffs contacted the lender to ask about the payoff amount remaining on the loan and were stunned to learn that they were allegedly responsible for over $80,000 in defaults from ***other investors in the Joint Venture Program.*** *See* **Exhibit M**.

95. This was the first time Plaintiffs learned that their closing documents had contained a collateral assignment provision that purported to make them responsible for other properties in the iFlip Joint Venture Program. After speaking further with the lender, Plaintiffs learned that the South Maryland Property, South Honore Property, South Bennett Property, South Ellis Property, South Wood Property and South Evans Property were all allegedly included in the collateral assignment agreement. *See* Ex. J. Notably, several of these properties closed only **after** Plaintiffs closed on the Property and could not have been known to Plaintiffs on the day of the closing on their own Property.

96. Upon information and belief, each of the defaults purportedly comprising the over $80,000 in fees Plaintiffs now owed were the direct result of the Beys' and iFlip's scheme. The Beys, iFlip, Covenant and Envision had been routinely using proceeds from one loan to pay debts or expenses affiliated with another loan or participant in the Joint Venture Program, all while promising investors that they would pay them back. In other words, the Beys, iFlip, Covenant and Envision were perpetrating a Ponzi scheme, which eventually forced many other victims into default and foreclosure.

97.     As a licensed attorney who focuses his practice on real estate transactions,[9] Ranjha was aware of the significant adverse implications the collateral assignment agreement could and would have on Plaintiffs on the day he facilitated the closing on the Property. Ranjha had also coordinated the closing directly with Envision, and he admitted in his text messages to Mr. Brown that he was at least familiar with Envision from other closing experiences. Upon information and belief, Ranjha had previously completed closings with Envision as the lender in connection with iFlip, Covenant, the Beys and the iFlip Joint Venture Program. Ranjha was therefore well aware of the existence of the collateral assignment agreement in Plaintiffs' closing documents, but he deliberately stayed silent about the agreement.

98.     Despite the fact that Ranjha was present at the closing on the Property, Ranjha was not acting on behalf of Plaintiffs as their attorney, as both Ranjha and Ramo Bey led Plaintiffs to believe he would. Ranjha appeared at the closing as an agent for iFlip, Covenant and the Beys, who had a vested interest in closing on the Property as parties to the Joint Venture agreement with Plaintiffs.

99.     Ranjha's role during the closing was to further iFlip's and the Beys' scheme by masquerading as Plaintiffs' attorney, luring Plaintiffs into the false belief that their interests were protected. Ranjha provided legitimacy and security to the transaction, as was his role, and was an integral part of persuading Plaintiffs to sign the collateral assignment provisions and other closing documents that benefitted the Beys, iFlip, Covenant and Ranjha himself.

100.    The Beys, iFlip and Covenant benefitted from the unconscionable collateral assignment agreement and the closing on the Property. Both the Beys and iFlip gained a substantial benefit from the collateral assignment agreement in the closing documents because the provisions

---

[9] *See* https://ranjhalaw.com/about/, **Exhibit N.**

shifted any liability for defaults on other properties with which iFlip was affiliated directly to Mr. Brown and Ms. Bailey.

101. Additionally, the Beys and Ranjha directly benefitted from the closing on the Property because of the hidden fees to Covenant, as well as the fee paid to Ranjha.

102. On August 1, 2024, a foreclosure action was instituted after the Property after Ramo Bey had failed to pay multiple mortgage payments on the Property that he promised Plaintiffs he would pay.

103. On May 8, 2025, the Property was foreclosed on and sold for only approximately $229,000, subjecting Mr. Brown and Ms. Bailey to a huge loss on the original $266,750 loan, interest charges, cross-collateralization charges and other fees.

104. On May 19, 2026, Michaele Bey's real estate license was revoked by the Illinois Department of Financial and Professional Regulation because of her fraudulent actions in connection with the iFlip business. *See* **Exhibit O.**

### COUNT I: VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO), 18 U.S.C. § 1962
**(All Defendants)**

105. Plaintiffs restate and re-allege Paragraphs 1 through 104 as if fully set forth herein.

106. Defendants are each capable of holding a legal or beneficial interest in property, and each is therefore a "person" within the meaning of 18 U.S.C. § 1961(3).

107. Each Defendant, as well as yet-unknown defendants, was associated in fact and constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). Specifically, the Beys, Ranjha, iFlip, Envision and Covenant, while not part of a single legal entity, collectively engaged in interstate commerce as part of an enterprise for the purpose of facilitating the iFlip scheme described herein. This enterprise shall be referred to as the "iFlip Scheme Enterprise."

108. The iFlip Scheme Enterprise constituted an ongoing organization from, upon information and belief, at least as early as July 2021 and at least as late as July 2023, which functioned as a unit for the common purpose of luring, securing and defrauding investors in the iFlip Joint Venture Program.

109. Each Defendant participated in, directly or indirectly, the conduct of the iFlip Scheme Enterprise through a pattern of racketeering activity, as described herein.

110. The iFlip Scheme Enterprise conducted its racketeering activity, in party, by using the interstate mails and wire communications, including by use of the telephones, electronic funds transfers and the mailing of checks between Illinois and Georgia, where Envision is located.

111. Through the iFlip Scheme Enterprise, or in conspiracy with it, Defendants conducted, engaged in and participated in a pattern of racketeering activity, which consisted of at least the following predicate acts:

a. In furtherance of a scheme to defraud; obtain money or property by false or fraudulent pretenses, representations or premises; and deprive Plaintiffs of the intangible right of honest services; the Beys, iFlip, Covenant, Ranjha and Envision utilized wire, radio or television communications in interstate commerce to plan for Envision to serve as the lender for the Property on terms that would unjustly enrich the Beys, iFlip, Covenant, Ranjha and Envision at Plaintiffs' expense;

b. In furtherance of a scheme to defraud; obtain money or property by false or fraudulent pretenses, representations or premises; and deprive Plaintiffs of the intangible right of honest services; the Beys, iFlip, Covenant, Ranjha and Envision utilized wire, radio or television communications in interstate commerce to plan for

Envision to prepare, receive or transmit the collateral assignment agreement to Plaintiffs as part of the closing documents on the Property;

c.    In furtherance of a scheme to defraud; obtain money or property by false or fraudulent pretenses, representations or premises; and deprive Plaintiffs of the intangible right of honest services; the Beys, iFlip, Covenant, Ranjha and Envision utilized wire, radio or television communications in interstate commerce to plan for Envision to transmit the loan proceeds to Plaintiffs, while directing a portion of the proceeds to Covenant and Ranjha as part of a scheme to fraudulently enrich Covenant, iFlip, the Beys and Ranjha at Plaintiffs' expense;

d.    In furtherance of a scheme to defraud; obtain money or property by false or fraudulent pretenses, representations or premises; and deprive Plaintiffs of the intangible right of honest services; the Beys, iFlip, Covenant, Ranjha and Envision utilized wire, radio or television communications in interstate commerce to plan for Envision to transmit the loan proceeds to Plaintiffs by using Ranjha to facilitate the closing while representing iFlip's, Covenant's, the Beys' and Envision's financial interests, all as part of a scheme to persuade Plaintiffs to close on the Property by scheme to fraudulently enrich Covenant, iFlip, the Beys and Ranjha at Plaintiffs' expense;

e.    In furtherance of a scheme to defraud; obtain money or property by false or fraudulent pretenses, representations or premises; and deprive Plaintiffs of the intangible right of honest services; the Beys, iFlip, Covenant and Envision utilized wire, radio or television communications in interstate commerce to coordinate, direct and effectuate Envision's transmission of the loan proceeds to Plaintiffs,

24

while directing a portion of the proceeds to Covenant and Ranjha as part of a scheme to fraudulently enrich Covenant, iFlip, the Beys and Ranjha at Plaintiffs' expense;

f.  In furtherance of a scheme to defraud; obtain money or property by false or fraudulent pretenses, representations or premises; and deprive Plaintiffs of the intangible right of honest services; the Beys, iFlip, Covenant and Envision utilized wire, radio or television communications in interstate commerce to coordinate and direct Envision to transmit Plaintiffs' loan proceeds to other participants in the iFlip Joint Venture Program without Plaintiffs' knowledge or informed consent as part of a scheme to fraudulently enrich Covenant, iFlip, the Beys and Ranjha at Plaintiffs' expense;

g.  In furtherance of a scheme to defraud; obtain money or property by false or fraudulent pretenses, representations or premises; and deprive Plaintiffs of the intangible right of honest services; the Beys, iFlip, Covenant and Envision utilized wire, radio or television communications in interstate commerce to coordinate and direct Envision to decline to use Plaintiffs' loan proceeds to pay the contractor working to rehab the Property, without Plaintiffs' knowledge or informed consent, as part of a scheme to fraudulently enrich Covenant, the Beys and Ranjha at Plaintiffs' expense; and

h.  In furtherance of a scheme to defraud; obtain money or property by false or fraudulent pretenses, representations or premises; and deprive Plaintiffs of the intangible right of honest services; the Beys, iFlip, Covenant, Envision and Ranjha utilized wire, radio or television communications in interstate commerce to

25

coordinate and direct each other to make false and misleading statements about the Property, Plaintiffs' loan proceeds, Plaintiffs' transaction history, the closing documents and Plaintiffs' rights and obligations.

112. Defendants acted, and conspired to act, together and in association with others knowingly, and repeatedly committed the above fraudulent acts in furtherance of and for the purpose of enriching themselves and furthering the ends of the iFlip Scheme Enterprise.

113. The predicate acts described above were related to one another and taken as part of a common scheme or plan to defraud Plaintiffs, use Plaintiffs' loan proceeds to unjustly enrich Defendants, and use Plaintiffs' loan proceeds to further the ends of the iFlip Scheme Enterprise.

114. Such unlawful conduct constituted a continuous pattern of racketeering activity that spanned from at least July 2021 through as least as late as July 2023.

115. As a direct and proximate cause of the aforementioned racketeering activities and violations of 18 U.S.C. § 1962, Plaintiffs have been injured in their business and property.

116. Defendants' racketeering activities caused Plaintiffs to make a down payment of over $50,000 and take out a hard money loan of over $266,000 to fund a rehab project on a property that had significant foundation problems that were concealed from Plaintiffs at the time of purchase by some or all Defendants. Additionally, Defendants' racketeering activities caused Plaintiffs to incur over $35,000 in damages to pay for contracting services that were only necessary as a direct and proximate result of Defendants' fraudulent acts and omissions. Defendants' racketeering activities caused Plaintiffs to incur over $80,000 in fees for defaults on other properties subject to iFlip's Joint Venture Program, which Plaintiffs had no direct or indirect financial interest in. As a direct and proximate result of Defendants' racketeering activity, the Property was foreclosed on in May 2025 and sold for only $229,000, forcing Plaintiffs to incur a huge loss on the hard money

loan, cross-collateralization fees, construction fees, interest and other costs associated with the Property.

117. All of these injuries were a foreseeable consequence of Defendants' racketeering activities and violations of 18 U.S.C. § 1962.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants and that Plaintiffs be awarded the following relief:

a) Compensatory, economic, consequential, statutory (treble) and punitive damages in an amount to be determined at trial;

b) Attorneys' fees, as provided for in the Joint Venture Agreement;

c) Prejudgment and post-judgment interest; and

d) Any other relief the Court deems to be equitable and just.

## COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Covenant)

118. Plaintiffs restate and re-allege Paragraphs 1 through 104 as if fully set forth herein.

119. The Joint Venture Agreement is a valid and enforceable agreement between Brailey and Covenant.

120. Under the Joint Venture Agreement, Covenant was obligated to, among other things, provide access to private hard-money lenders to acquire and rehab the Property; identify a property for the purpose of rehabbing and selling it to new homeowners; and serve as the construction manager for renovations of the Property.

121. Under the Joint Venture Agreement, Covenant was afforded discretion to perform the aforementioned obligations.

122. Based on the Joint Venture Agreement's contractual provision affording Covenant discretion in procuring a private hard-money lender, Plaintiffs reasonably expected Covenant to secure a reputable hard-money lender with reasonable repayment terms.

123. Based on the Joint Venture Agreement's contractual provision affording Covenant discretion in procuring a property for rehabilitation, Plaintiffs reasonably expected Covenant to disclose any known defects with the property, including defects in the property's foundation.

124. Based on the Joint Venture Agreement's contractual provision affording Covenant discretion in serving as the construction manager for the property, Plaintiffs reasonably expected Covenant to properly manage construction, including by paying contractors and sub-contractors hired to perform work on the Property.

125. Covenant breached the implied covenant of good faith and fair dealing by exercising its discretion to perform the foregoing obligations with an improper motive, capriciously, and in a manner inconsistent with the reasonable expectations of Plaintiffs by: (i) securing a hard-money lender in which the Beys and Covenant had a pre-existing financial interest; (ii) securing a hard-money lender requiring that Plaintiffs sign a collateral assignment agreement and assume obligations for properties they do not own or have any interest in exchange for closing on their own property; (iii) securing a hard-money lender that the Beys and Covenant knew would re-direct Plaintiffs' loan proceeds to other Joint Venture Program participants, depleting Plaintiffs of their loan proceeds and requiring them to use their own funds to rehab the Property; (iv) failing to disclose to Plaintiffs that the Property had significant foundation issues that would increase the cost of rehabilitation on the Property; (v) failing to disclose that the Beys would obtain a financial benefit from the hard-money loan proceeds in the form of a payment to Covenant that was not

discussed or permitted by the Joint Venture Agreement; and (vi) failing to pay the contractor Covenant and the Beys retained to rehabilitate the Property.

126. As a direct and proximate result of Covenant's breaches, Plaintiffs suffered significant monetary damages and mental anguish.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Covenant and that Plaintiffs be awarded the following relief:

a) Compensatory, economic and consequential in an amount to be determined at trial;

b) Attorneys' fees, as provided for in the Joint Venture Agreement;

c) Prejudgment and post-judgment interest; and

d) Any other relief the Court deems to be equitable and just.

## COUNT III: BREACH OF CONTRACT
### (Covenant)

127. Plaintiffs restate and re-allege Paragraphs 1 through 104 as if fully set forth herein.

128. The Joint Venture Agreement is a valid and enforceable contract between Brailey and Covenant.

129. Brailey fully performed its obligations under the Joint Venture Agreement.

130. Covenant breached the Joint Venture Agreement by: (i) luring and fraudulently inducing Plaintiffs into entering the agreement in bad faith and for the purpose of realizing a financial gain from Plaintiffs' loan proceeds; (ii) securing a hard-money lender in which the Beys and Covenant had a pre-existing financial interest; (iii) securing a hard-money lender requiring that Plaintiffs sign a collateral assignment agreement and assume obligations for properties they do not own or have any interest in exchange for closing on their own property; (iv) securing a hard-money lender that the Beys and Covenant knew would re-direct Plaintiffs' loan proceeds to

other Joint Venture Program participants, depleting Plaintiffs of their loan proceeds and requiring them to use their own funds to rehab the Property; (v) failing to disclose to Plaintiffs that the Property had significant foundation issues that would increase the cost of rehabilitation on the Property; (vi) failing to disclose that the Beys would obtain a financial benefit from the hard-money loan proceeds in the form of a payment to Covenant that was not discussed or permitted by the Joint Venture Agreement; and (vii) failing to pay the contractor Covenant and the Beys retained to rehabilitate the Property.

131.    As a direct and proximate result of Covenant's breach of the Joint Venture Agreement, Plaintiffs have suffered monetary damages and mental anguish.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Covenant and that Plaintiffs be awarded the following relief:

a)      Compensatory, economic, consequential and punitive damages in an amount to be determined at trial;

b)      Attorneys' fees, as provided for in the Joint Venture Agreement;

c)      Prejudgment and post-judgment interest; and

d)      Any other relief the Court deems to be equitable and just.

### COUNT IV: FRAUDULENT CONCEALMENT
**(All Defendants)**

132.    Plaintiffs restate and re-allege Paragraphs 1 through 104 as if fully set forth herein.

133.    In luring Plaintiffs to sign the Joint Venture Agreement, close on the Property and continue participating in the Joint Venture Program, the Beys, Covenant and iFlip concealed numerous material facts. These include:

a.      The fact that iFlip was not a licensed real estate broker or agency in the State of Illinois;

30

b. The fact that the Beys and iFlip had a pre-existing financial interest in Envision, the lender the Beys and iFlip selected to finance Plaintiffs' purchase of the Property;

c. The fact that Plaintiffs would be required to sign a collateral assignment agreement in exchange for a hard-money loan;

d. The fact that the collateral assignment agreement Plaintiffs would be required to sign would render Plaintiffs responsible for the financial obligations or defaults of other members of iFlip's Joint Venture Program;

e. The fact that Envision would re-direct Plaintiffs' own loan proceeds to other members of iFlip's Joint Venture Program at iFlip and the Beys' direction;

f. The fact that the Property had significant foundation problems;

g. The fact that Plaintiffs would, at the time of the closing on the Property, be using some of the loan proceeds to make a payment to Covenant that was not discussed or permitted by the Joint Venture Agreement; and

h. The fact that Ranjha was iFlip's, Covenant's and the Beys' agent, attorney and customer, and would be attending the closing on behalf of iFlip, Covenant and the Beys, not as legal counsel representing Plaintiffs' interests.

134. In persuading Plaintiffs to sign the closing documents and close on the Property, Ranjha concealed the material facts that: (i) he was an attorney for iFlip who attended the closing on behalf of iFlip, Covenant and the Beys, not Plaintiffs; (ii) the closing documents contained a collateral assignment agreement that would render Plaintiffs responsible for the financial obligations or defaults of other members of iFlip's Joint Venture Program; (iii) that the closing documents contained a blank schedule to conceal the fact that there were other properties for which

31

Plaintiffs would later be held financially responsible pursuant to the collateral assignment agreement; and (iv) that Covenant would obtain a portion of the proceeds from Plaintiffs' loan.

135. Envision concealed the material fact of the multiple properties that Plaintiffs would be financially responsible for in the event that the loans for those properties went into default by failing to include a complete schedule in the closing documents identifying and describing those properties.

136. The Beys, iFlip, Covenant, Envision and Ranjha concealed the foregoing material facts from Plaintiffs for the purpose of inducing Plaintiffs to falsely believe that iFlip and the Beys had the skill and expertise to finance and rehabilitate the Property; that iFlip was a legitimate, successful real estate venture backed by reputable financial institutions and other professionals; that Plaintiffs' interests were adequately represented at the closing; and that Plaintiffs should partner with iFlip, Covenant and the Beys to purchase and rehabilitate the Property.

137. Plaintiffs reasonably relied on the Beys, iFlip, Covenant, Ranjha and Envision's representations because Plaintiffs had signed the Joint Venture Agreement with Covenant; because the Beys and iFlip had touted the success of other property rehab projects; because the Beys and Covenant had promised to source the lending institution and attorney to facilitate the closing; and because Ranjha was a licensed attorney.

138. Had Plaintiffs known any of the foregoing concealed facts, Plaintiffs would have declined to sign the closing documents as written; would have obtained their own counsel to review the closing documents; and would have reconsidered participating in the Joint Venture Program or partnering with the Beys and any of their affiliated entities.

139. As a direct and proximate result of Defendants' acts and omissions, and Plaintiffs' reasonable reliance thereon, Plaintiffs suffered significant damages, including monetary damages, emotional distress and mental anguish.

140. By their acts and omissions described above and incorporated herein, Defendants acted willfully and with such gross negligence as to indicate a wanton disregard of Plaintiffs' rights, justifying an award of punitive damages.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants and that Plaintiffs be awarded the following relief:

a) Compensatory, economic, consequential and punitive damages in an amount to be determined at trial;

b) Prejudgment and post-judgment interest; and

c) Any other relief the Court deems to be equitable and just.

### COUNT V: VIOLATION OF THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT (815 ILCS 505/1 et seq.)
### (Michaele Bey, Ramo Bey, iFlip, Covenant, Envision)

141. Plaintiffs restate and re-allege Paragraphs 1 through 104 as if fully set forth herein.

142. The Beys, iFlip, Covenant and Envision made numerous deliberate affirmative and material misrepresentations in order to induce Plaintiffs to enter into the Joint Venture Agreements and to purchase the Property in order to use Plaintiffs loan proceeds to fund Defendants' scheme.

143. The Beys, iFlip, Covenant and Envision also knowingly and intentionally caused confusion and misunderstanding as to the sponsorship and approval of the Property and the Joint Venture Program by failing to disclose foundational issues with the Property, failing to disclose the existence and requirement of the collateral assignment agreement in the closing documents,

33

and generally failing to disclose that Plaintiffs would be personally financially responsible for rehabilitation and repairs as a result of their loan proceeds being redirected to other participants in the Joint Venture Program.

144.    By engaging in the unlawful and fraudulent conduct detailed herein, the Beys, iFlip, Covenant and Envision have engaged in a fraudulent scheme in violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

145.    By their acts and omissions described above and incorporated herein, the Beys, iFlip, Covenant and Envision acted willfully and with such gross negligence as to indicate a wanton disregard of Plaintiffs' rights, justifying an award of punitive damages.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against the Beys, iFlip, Covenant and Envision and that Plaintiffs be awarded the following relief:

a)    Compensatory, economic, consequential and punitive damages in an amount to be determined at trial;

b)    Attorneys' fees;

c)    Prejudgment and post-judgment interest; and

d)    Any other relief the Court deems to be equitable and just.

### COUNT VI: FRAUD
### (Ramo Bey, Michaele Bey, iFlip, Covenant)

146.    Plaintiffs restate and re-allege Paragraphs 1 through 104 as if fully set forth herein.

147.    In luring Plaintiffs to sign the Joint Venture Agreement, close on the Property and continue participating in the Joint Venture Program, the Beys, Covenant and iFlip made numerous false statements of fact. These include:

a.    The fact that Ramo Bey was a successful real estate investor whose expertise would cause Plaintiffs to earn gains on their investment in the Property;

34

b. The fact that Ranjha would act as Plaintiffs' attorney and represent their interests at the closing on the Property;

c. The fact that the Property was a suitable property for Plaintiffs to flip;

d. The fact that Envision was a suitable lender for the sale of the Property; and

e. The fact that the contractor the Beys and Covenant hired to rehab the Property stopped construction on the Property and demanded more money due to inflated supply prices as opposed to the Beys' and Covenant's failures to pay him.

148. The Beys, Covenant and iFlip concealed the foregoing material facts from Plaintiffs for the purpose of inducing Plaintiffs to falsely believe that Covenant, iFlip and the Beys had the skill and expertise to finance and rehabilitate the Property; that iFlip was a legitimate, successful real estate venture backed by reputable financial institutions and other professionals; that Plaintiffs' interests were adequately represented at the closing; and that Plaintiffs should partner and continue to work with Covenant, iFlip and the Beys to purchase and rehabilitate the Property.

149. Plaintiffs reasonably relied on the Beys', Covenant's and iFlip's representations because Plaintiffs had signed the Joint Venture Agreement with Covenant; because the Beys and iFlip had touted the success of other property rehab projects; because the Beys and Covenant had promised to source the lending institution and attorney to facilitate the closing; and because Ranjha was a licensed attorney.

150. Had Plaintiffs known any of the foregoing concealed facts, Plaintiffs would have declined to sign the closing documents as written; would have obtained their own counsel to review the closing documents; would have reconsidered participating in the Joint Venture Program or partnering with the Beys or any of their affiliated entities; and would have become aware that the Beys, Covenant and iFlip had defrauded them.

151. As a direct and proximate result of Defendants' acts and omissions, and Plaintiffs' reasonable reliance thereon, Plaintiffs suffered significant damages, including monetary damages, emotional distress and mental anguish.

152. By their acts and omissions described above and incorporated herein, Defendants acted willfully and with such gross negligence as to indicate a wanton disregard of Plaintiffs' rights, justifying an award of punitive damages.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants and that Plaintiffs be awarded the following relief:

a) Compensatory, economic, consequential and punitive damages in an amount to be determined at trial;

b) Prejudgment and post-judgment interest; and

c) Any other relief the Court deems to be equitable and just.

### COUNT VII: CONSPIRACY TO COMMIT FRAUD
**(All Defendants)**

153. Plaintiffs restate and re-allege Paragraphs 1 through 104 as if fully set forth herein.

154. Before Plaintiffs closed on the Property, Defendants agreed that they would work together to induce Plaintiffs to sign the closing documents and join iFlip's fraudulent Joint Venture Program.

155. Specifically, the Beys and iFlip contacted and selected Envision to serve as the lender for the Property, and Envision agreed. The Beys and iFlip contacted Ranjha to attend the closing on the Property, and Ranjha agreed.

156. Ranjha coordinated the closing on the Property directly with Envision.

157. Envision, the Beys, iFlip and Ranjha agreed to play a role in the closing on the Property for the unlawful purpose of luring Plaintiffs into a scheme that would financially benefit

the Beys, iFlip, Envision, Covenant and Ranjha at the expense of Plaintiffs, who would pay fees to Ranjha and Covenant at the closing and finance other properties in the Joint Venture Program.

158. Envision, the Beys, iFlip and Ranjha agreed to play a role in the closing on the Property by using unlawful means, as described below.

159. In luring Plaintiffs to sign the Joint Venture Agreement, close on the Property and continue with the Joint Venture Program, the Beys and Covenant concealed numerous material facts. These include:

    a.    The fact that iFlip was not a licensed real estate broker or agency in the State of Illinois;

    b.    The fact that the Beys and iFlip had a pre-existing financial interest in Envision, the lender the Beys and iFlip selected to finance Plaintiffs' purchase of the Property;

    c.    The fact that Plaintiffs would be required to sign a collateral assignment agreement in exchange for a hard-money loan;

    d.    The fact that the collateral assignment agreement Plaintiffs would be required to sign would render Plaintiffs responsible for the financial obligations or defaults of other members of iFlip's Joint Venture Program;

    e.    The fact that Envision would re-direct Plaintiffs' own loan proceeds to other members of iFlip's Joint Venture Program at iFlip and the Beys' direction;

    f.    The fact that the Property had significant foundation problems;

    g.    The fact that Plaintiffs would, at the time of the closing on the Property, be using some of the loan proceeds to make a payment to Covenant that was not discussed or permitted by the Joint Venture Agreement; and

h. The fact that Ranjha was iFlip's, Covenant's and the Beys' agent, attorney and customer, and would be attending the closing on behalf of iFlip, Covenant and the Beys, not as legal counsel representing Plaintiffs' interests.

160. In persuading Plaintiffs to sign the closing documents and close on the Property, Ranjha concealed the material facts that: (i) he was an attorney for iFlip, the Beys and Covenant who attended the closing on behalf of iFlip, Covenant and the Beys, not Plaintiffs; (ii) the closing documents contained a collateral assignment agreement that would render Plaintiffs responsible for the financial obligations or defaults of other members of iFlip's Joint Venture Program; (iii) that the closing documents contained a blank schedule to conceal the fact that there were other properties for which Plaintiffs would later be held financially responsible pursuant to the collateral assignment agreement; and (iv) that Covenant would obtain a portion of the proceeds from Plaintiffs' loan.

161. Envision concealed the material fact of the multiple properties that Plaintiffs would be financially responsible for in the event that the loans for those properties went into default by failing to include a complete schedule in the closing documents identifying and describing those properties.

162. The Beys, iFlip, Covenant, Envision and Ranjha concealed the foregoing material facts from Plaintiffs for the purpose of inducing Plaintiffs to falsely believe that iFlip, Covenant and the Beys had the skill and expertise to finance and rehabilitate the Property; that iFlip was a legitimate, successful real estate venture backed by reputable financial institutions and other professionals; that Plaintiffs' interests were adequately represented at the closing; and that Plaintiffs should partner with iFlip, Covenant and the Beys to purchase and rehabilitate the Property.

38

163. Plaintiffs reasonably relied on the Beys, iFlip, Covenant, Ranjha and Envision's representations because Plaintiffs had signed the Joint Venture Agreement with Covenant; because the Beys and iFlip had touted the success of other property rehab projects; because the Beys and Covenant had promised to source the lending institution and attorney to facilitate the closing; and because Ranjha was a licensed attorney.

164. Had Plaintiffs known any of the foregoing concealed facts, Plaintiffs would have declined to sign the closing documents as written; would have obtained their own counsel to review the closing documents; and would have reconsidered participating in the Joint Venture Program or partnering with the Beys or any of their affiliated entities.

165. As a direct and proximate result of Defendants' acts and omissions, and Plaintiffs' reasonable reliance thereon, Plaintiffs suffered significant damages, including monetary damages, emotional distress and mental anguish.

166. By their acts and omissions described above and incorporated herein, Defendants acted willfully and with such gross negligence as to indicate a wanton disregard of Plaintiffs' rights, justifying an award of punitive damages.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants and that Plaintiffs be awarded the following relief:

a) Compensatory, economic, consequential and punitive damages in an amount to be determined at trial;

b) Prejudgment and post-judgment interest; and

c) Any other relief the Court deems to be equitable and just.

### COUNT VIII: AIDING AND ABETTING FRAUD
**(Envision, Ranjha)**

167. Plaintiffs restate and re-allege Paragraphs 1 through 104 as if fully set forth herein.

168. iFlip, the Beys and Covenant knowingly and intentionally defrauded Plaintiffs by luring them into the iFlip Joint Venture Program, concealing material facts about Plaintiffs' obligations under the Property closing documents, concealing material facts about the Property, and concealing material facts about Ranjha's dealings with iFlip, Covenant and the Beys.

169. Ranjha aided and abetted iFlip, the Beys and Covenant in defrauding Plaintiffs.

170. Specifically, Ranjha attended numerous closings on behalf of iFlip, Covenant and the Beys as part of other individuals' participation in the iFlip Joint Venture Program. In doing so, Ranjha became aware of the collateral assignment agreements other participants signed, and became aware of other properties for which Plaintiffs unknowingly assumed a financial obligation at the closing on the Property.

171. Ranjha was aware that he was attending the closing on the Property under the guise of Plaintiffs' attorney, when in fact he was sent by the Beys, iFlip and Covenant and was acting as a representative of the Beys, iFlip and Covenant, not Plaintiffs.

172. Ranjha was aware that Plaintiffs were not represented by independent counsel and were inexperienced real estate investors who would not reasonably expect an onerous agreement like the collateral assignment agreement to be in their closing documents. Ranjha was also aware that the schedule describing the other properties subject to the collateral assignment agreement was intentionally left blank to conceal the fact that Plaintiffs would be held financially responsible for defaults on other properties participating in the iFlip Joint Venture Program.

173. Ranjha was aware that by failing to point out or explain the collateral assignment agreement to Plaintiffs, Plaintiffs would proceed with signing the closing documents and further perpetrating iFlip's, the Beys' and Covenant's scheme.

40

174. By appearing at the closing at the Beys', Covenant's and iFlip's direction and implying he was attending to represent Plaintiffs' interests, Ranjha knowingly and substantially assisted the Beys, iFlip and Covenant in perpetrating the fraudulent Joint Venture Program.

175. Envision also aided and abetted iFlip, the Beys and Covenant in defrauding Plaintiffs.

176. Envision concealed the material fact of the multiple properties that Plaintiffs would be financially responsible for in the event that the loans for those properties went into default by failing to include a complete schedule in the closing documents identifying and describing those properties.

177. Envision concealed the material fact that it was re-directing loan proceeds belonging to Plaintiffs to fund other properties and participants in the Joint Venture Program.

178. Envision knowingly and substantially assisted iFlip, the Beys and Covenant in defrauding Plaintiffs by requiring that Plaintiffs sign the collateral assignment agreement, failing to include a complete schedule identifying the other properties subject to that agreement in the closing documents, and redirecting and converting Plaintiffs' loan proceeds to other Joint Venture Program participants and properties.

179. As a direct and proximate result of Envision and Ranjha's acts and omissions, and Plaintiffs' reasonable reliance thereon, Plaintiffs suffered significant damages, including monetary damages, emotional distress and mental anguish.

180. By their acts and omissions described above and incorporated herein, Envision and Ranjha acted willfully and with such gross negligence as to indicate a wanton disregard of Plaintiffs' rights, justifying an award of punitive damages.

41

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Envision and Ranjha and that Plaintiffs be awarded the following relief:

a) Compensatory, economic, consequential and punitive damages in an amount to be determined at trial;

b) Prejudgment and post-judgment interest; and

c) Any other relief the Court deems to be equitable and just.

Dated: June 25, 2026

Respectfully submitted,

*/s/ Katie A. O'Neill*
Katie A. O'Neill
**O'NEILL LAW LLC**
125 S. Clark St., Suite 1700
Chicago, IL 60603
(312) 242-2002
katie@olawlit.com

Brian C. Miller
**BRIAN C. MILLER LAW FIRM LLC**
180 N. Stetson Ave., Suite 3500
Chicago, IL 60601
(847) 971-3727
brian@bcmlawyer.com

*Attorneys for Plaintiffs Lynn Bailey, Lance Brown and Brailey Investments LLC*

42